EXHIBIT B

COMPLAINT TO TRANS UNION, LLC

STATE OF MINNESOTA                                   DISTRICT COURT
COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                                    Case Type: Other Civil

| | |
|---|---|
| Sean Burke,<br><br>               Plaintiff,<br><br>v.<br><br>Trans Union LLC and San Mateo<br>Credit Union,<br><br>             Defendants. | Court File No.:<br>Judge:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.  The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information

on consumers. The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

2. The FCRA protects consumers through a tightly wound set of procedural protections from the material risk of harms that otherwise flow from inaccurate reporting. Thus, through the FCRA, Congress struck a balance between the credit industry's desire to base credit decisions on accurate information, and consumers' substantive right to protection from damage to reputation, shame, mortification, and the emotional distress that naturally follows from inaccurate reporting of a consumer's fidelity to his or her financial obligations.

3. Sean Burke ("Plaintiff"), by Plaintiff's attorneys, brings this action to challenge the actions of Defendants Trans Union LLC ("Trans Union" or "TU") and San Mateo Credit Union ("San Mateo") (jointly as "Defendants"), with regard to erroneous reports of derogatory credit information and Defendants' failure to properly investigate Plaintiff's disputes.

4. Defendants failed to properly investigate Plaintiff's disputes, damaging Plaintiff's creditworthiness.

5. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

6. Unless otherwise stated, all the conduct engaged in by Defendants took place in Minnesota.

---

7.   Defendants committed each of these violations knowingly, willfully, and intentionally, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

8.   Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heir, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant named.

9.   Through this Complaint, Plaintiff does not allege that any state court judgment was entered against anyone in error, and Plaintiff does not seek to reverse or modify any judgment of any state court.

## JURISDICTION AND VENUE

10.  Jurisdiction of this Court arises pursuant to general state jurisdiction.

11.  Plaintiff is an individual residing in the County of Hennepin, State of Minnesota.

12.  Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

13.  Defendant Trans Union is a business entity doing business in the County of Hennepin, State of Minnesota.

14.  Defendant Trans Union's registered agent address is: Prentice-Hall Corp System Inc., 2345 Rice Street, Suite 230, Roseville, MN 55113.

15.  Defendant Trans Union regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and

use interstate commerce to prepare and/or furnish the reports. Trans Union is a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

16. Plaintiff is informed and believes and on that basis alleges that at all times mentioned herein Trans Union was the principal, agent or employee and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which Trans Union is liable to Plaintiff or the relief prayed for herein.

17. Defendant San Mateo is an entity doing business in the County of Hennepin, State of Minnesota.

18. Defendant San Mateo's registered agent address is: 350 Convention Way, Redwood, CA 94063.

19. The creditor named herein, San Mateo, is a furnisher of information as contemplated by 15 U.S.C. § 1681s-2(b) that regularly and in the ordinary course of business furnish information to a consumer credit reporting agency.

20. Plaintiff is informed and believes and on that basis alleges that at all times mentioned herein San Mateo was the principal, agent or employee and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which San Mateo is liable to Plaintiff or the relief prayed for herein.

21. Plaintiff is informed and believes and thereon alleges that all acts of corporate employees as hereinafter alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

22. Venue lies with this Court pursuant to Minn. Stat. § 542.01 because that is where the events or omissions giving rise to this action occurred.

## FACTUAL ALLEGATIONS

23. On or about December 4, 2017, Plaintiff incurred a debt with San Mateo, with an account number beginning in ███, related to financial obligations on an automobile (the "Account").

24. On or about September 25, 2019, Plaintiff filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the District of Minnesota pursuant to 11 U.S.C. § 1301 *et seq*. Plaintiff's case was assigned Case Number 19-42898 (the "Bankruptcy").

25. On or about November 15, 2019, Plaintiff entered into a reaffirmation agreement with San Mateo as to the Account (the "Reaffirmation Agreement").

26. San Mateo had notice of the Reaffirmation Agreement.

27. San Mateo caused the Reaffirmation Agreement to be signed by San Mateo.

28. On or about December 10, 2019, Plaintiff filed the Reaffirmation Agreement in the Bankruptcy to reaffirm his obligation to San Mateo and exclude the Account from the Bankruptcy.

29. Plaintiff did not rescind his Reaffirmation Agreement with San Mateo.

30. Plaintiff performed his obligations to San Mateo in accord with the Reaffirmation Agreement.

31. Plaintiff received a discharge in the Bankruptcy on December 26, 2019.

32. Specifically excluded from the Bankruptcy discharge were "Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts."

33. It is illegal and inaccurate for Defendants to report any post-Bankruptcy derogatory collection information, which was inconsistent with the Orders entered by the Bankruptcy Court.

34. However, Defendants either reported or caused to be reported inaccurate information after the Bankruptcy as discussed herein.

### *Metro 2 Reporting Standards*

35. Defendants' inaccurate reporting did not comply with the Consumer Data Industry Association's Metro 2 reporting standards ("Metro 2"), which provides guidance for credit reporting and FCRA compliance.

36. The Consumer Data Industry Association ("CDIA") publishes Metro 2 to assist furnishers with their compliance requirements under the FCRA.

37. Courts rely on such guidance to determine furnisher liability. *See e.g., In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005) (finding that "industry standards require that a debt discharged in bankruptcy be reported to a credit

reporting agency with the notation 'Discharged in bankruptcy' and with a zero balance due").

38. On information and belief, Defendants adopted and at all times relevant implemented Metro 2.

39. On information and belief, Defendants adopted Metro 2 and at all times relevant implemented Metro 2 as an integral aspect of their respective duties under the FCRA to have in place adequate and reasonable policies and procedures to handle investigations of disputed information.

40. Despite Metro 2's instructions, Defendants failed to conform to Metro 2 when reporting on Plaintiff's accounts after the Plaintiff filed Bankruptcy as further set forth below.

41. To this end, the adverse reporting on the Plaintiff's reports departed from the credit industry's own reporting standards and was not only inaccurate, but also materially misleading under the CDIA's standards as well.

### *The Impact of Inaccurate or Misleading Information on Consumer Reports*

42. A "Consumer Report", as defined by 15 U.S.C. § 1681a(d)(1), impacts a consumer's eligibility for:

   i.   credit or insurance to be used primarily for personal, family, or household purposes;

   ii.  employment purposes; or

   iii. any other purpose authorized under section 1681b.

43. As a result, the information held within a consumer report impacts not only a consumer's credit worthiness, rating, and capacity, but also the character, general reputation, and personal characteristics of the consumer.

44. A Federal Trade Commission study mandated by Congress on credit report accuracy ("FTC Study") found that one in five consumers had an error on at least one of their three major credit reports (Equifax, Experian, and Trans Union), with some consumers experiencing inaccuracies that can depress credit scores by over 100 points. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

45. The FTC Study found that the types of errors on consumer reports could lead to consumers paying more for products such as auto loans and insurance. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

### *Credit Scoring*

46. The Fair Isaac Corporation credit risk scoring system, also known as "FICO", is a ubiquitous credit scoring system and utilizes data reported by credit reporting agencies. *See* https://www.myfico.com/credit-education/credit-scores/ .

47. Defendants' departures from the credit industry's own reporting standards have caused Plaintiff to suffer from reduced FICO credit scores.

48.  The Fair Isaac Corporation uses the data in consumer reports to calculate credit scores that it assigns to consumers.

49.  The term "credit score" is a numerical value or a categorization used to predict the likelihood of certain credit behaviors, including default. *See* http:// files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf.

50.  FICO scores are calculated from credit data in a consumer's credit report that are arranged in five main categories. Those categories are identified and weighted as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/ length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score/.

51.  Payment history is typically weighted as the most important aspect of a consumer's overall credit score because it shows how the consumer has managed their finances, including: any late payments, how long the consumer has been managing their accounts, when their last payments were made, and any recent charges. *See, e.g.,* https://www.transunion.com/credit-score.

52.  A consumer's credit score impacts that consumer's cost of credit (e.g., interest rates, fees, etc.), availability of credit, ratings for insurance products,

and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extend financing periods, lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines.

53. Inaccurate or incorrect credit reporting often results in a lower FICO (and other credit scoring model) scores, thus creating higher costs of credit for the consumer, diminished opportunities, and less purchasing power.

54. Here, incorrectly reporting Plaintiff's Account as included in bankruptcy, with no balance—when the Account was in fact reaffirmed and paying as agreed—adversely affects Plaintiff's FICO score, as it excludes any recent positive payment history associated with the Account and it alters the age/ length of credit history, and it alters the mix of accounts/types.

55. There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score; i.e., a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's ability to receive credit, the type of credit, or rates of that credit that a consumer may receive.

56. Consistent with the FTC Study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/.

*Defendants' Inaccurate Reporting of the Account on the TU Credit Report*

57. In Plaintiff's credit report from TU dated sometime after December 26, 2019 but before April 8, 2020 (the "TU Credit Report"), TU and San Mateo failed to report accurate information regarding the Account.

58. Due to Plaintiff's Reaffirmation Agreement on the Account, TU and San Mateo were required to report that the Account was reaffirmed and current or paying as agreed on the TU Credit Report.

59. Instead, TU and San Mateo reported that the Account's pay status was "Account Included in Bankruptcy" on Plaintiff's TU Credit Report.

60. TU and San Mateo's failure to report any recent payment history further gives the materially misleading impression that the Account was discharged in Bankruptcy and denies Plaintiff of the positive payment history on the Account.

61. Through the Reaffirmation Agreement between San Mateo and Plaintiff, as well as the subsequent discharge Order in the Bankruptcy, the Account was reaffirmed and not included in the Bankruptcy or otherwise discharged.

62. It was therefore inaccurate for TU and San Mateo to report that the Account was included in bankruptcy on Plaintiff's TU Credit Report.

*Plaintiff's Dispute*

63.   On or after April 8, 2020, Plaintiff disputed TU's reporting regarding the Account pursuant to 15 U.S.C. § 1681i by notifying TU, in writing, of the incorrect and inaccurate credit information.

64.   Plaintiff sent a letter to TU requesting the above inaccurate and incorrect derogatory information be updated, modified or corrected as to the Account.

65.   TU was required to conduct a reinvestigation into the Account on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

66.   TU was required to send notice of Plaintiff's dispute to San Mateo, pursuant to 15 U.S.C. § 1681i(a)(2).

67.   Upon information and belief, TU notified San Mateo of Plaintiff's dispute.

68.   Upon information and belief, San Mateo received notice of Plaintiff's dispute as to the reporting of the Account on the TU Credit Report.

69.   A reasonable investigation by Trans Union would have indicated that it was reporting the Account inaccurately on the TU Credit Report.

70.   A reasonable investigation by San Mateo would have indicated that it was reporting the Account inaccurately on Plaintiff's TU Credit Report.

71.   San Mateo failed to conduct a reasonable investigation despite being party to the Reaffirmation Agreement and receiving notice of the inaccurate information on Plaintiff's TU Credit Report from Plaintiff's dispute letter to TU.

72. Instead, San Mateo re-reported the Account inaccurately to TU.

73. TU re-reported the Account inaccurately as well.

***The Continued Inaccurate Reporting of the Account on the TU Report***

74. On TU investigation results dated May 2, 2020 ("TU Investigation Results"), TU and San Mateo failed to accurately report the Account as reaffirmed and current or paying as agreed.

75. Instead, on the TU Investigation Results, TU and San Mateo inaccurately reported that Account's pay status was "Account Included in Bankruptcy".

76. TU and San Mateo also inaccurately reported the Account was closed on March 31, 2020.

77. TU and San Mateo also reported the remark "Chapter 7 Bankruptcy" on the Account on Plaintiff's TU Credit Report.

78. TU and San Mateo continued to fail to report any recent payment history, thus depriving Plaintiff of the positive information on the Account and further reinforcing the inaccurate and materially misleading impression that the Account was discharged in Bankruptcy.

79. TU and San Mateo's reporting was inaccurate because the Account was not included in the Bankruptcy or discharged, but was reaffirmed.

80. San Mateo's failures were egregious in that San Mateo received notice of the inaccurate reporting on the TU Credit Report, had actual knowledge of the Reaffirmation Agreement prior to Plaintiff's dispute due to San Mateo being

party to the Reaffirmation Agreement, and had actual knowledge of the reaffirmed status of the Account by virtue of San Mateo continuing to take Plaintiff's payments pursuant to the Reaffirmation Agreement—yet San Mateo affirmed the inaccurate reporting of the Account to TU and caused the Account to continue to report inaccurately.

81.   TU's failures were particularly noteworthy in that TU received notice of the inaccurate reporting on the TU Credit Report and had access to Plaintiff's publicly accessible Bankruptcy documents, yet TU continued to report the Account inaccurately.

### *Defendants' Failures and Plaintiff's Damages*

82.   Reporting an account was "included in bankruptcy" has no meaningful different from reporting that an account was "discharged in bankruptcy"— that is, the phrases viewed as having the same meaning. *See Diaz v. Trans Union, LLC*, No. 1:18-cv-01341-DAD-EPG, 2019 U.S. Dist. LEXIS 95549, at *7 (E.D. Cal. June 5, 2019) ("Indeed, many courts considering this very issue have concluded that '[t]here is no meaningful difference between the phrase included in bankruptcy and the phrase discharged in bankruptcy.") (citing *Butler v. Equifax Info. Servs., LLC, No.* 5:18-cv-02084-JGB-SHK (C.D. Cal. Apr. 3, 2019)); *Smith v. Trans Union, LLC*, No. 2:18-cv-13098-GCS-SDD (E.D. Mich. May 10, 2019); *Fleming v. Trans Union, LLC*, No. 2:18-cv-9785-PA-PLA (C.D. Cal. March 8, 2019).

83. It is inaccurate and/or materially misleading to report an account was included in bankruptcy when the account was instead reaffirmed and not included in bankruptcy or discharged in bankruptcy.

84. Reporting that an account was included in bankruptcy instead of reporting that the account was reaffirmed is detrimental to a consumer's credit reputation.

85. Failing to report recent payment information in conjunction with bankruptcy notations gives the inaccurate and/or materially misleading impression that an account was included in bankruptcy.

86. As evidenced by TU's failure to correct the reporting of Plaintiff's Account despite receiving knowledge of the bankruptcy, reaffirmation, and having access to search Plaintiff's publicly available bankruptcy information, TU failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates as required by and in violation of 15 U.S.C. § 1681e(b).

87. As evidenced by the inaccurate re-reporting after Plaintiff sent Defendants a detailed dispute identifying the inaccurate information related to Plaintiff's Account, Defendants, upon receipt of Plaintiff's dispute, failed to conduct an investigation or reinvestigation with respect to the disputed information as required by 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

88.  Defendants failed to review all relevant information provided by Plaintiff in the dispute to Defendants, as required by and in violation of 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

89.  Due to Defendants' failure to reasonably investigate, Defendants further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

90.  Defendants' continued inaccurate and negative reporting of the Account in light of their knowledge of the actual error was willful. Plaintiff is, accordingly, eligible for statutory damages.

91.  San Mateo had actual knowledge of the Reaffirmation Agreement, since it was a party to the Reaffirmation Agreement, but chose to inaccurately report that the Account was in Bankruptcy in response to Plaintiff's dispute.

92.  San Mateo continued to accept Plaintiff's payments after the Reaffirmation Agreement was executed by Plaintiff and San Mateo and after Plaintiff received the discharge order in his Bankruptcy.

93.  San Mateo's acceptance of the Reaffirmation Agreement, knowledge of the filing of the Reaffirmation Agreement in the Bankruptcy, and continued acceptance of payments on the Account indicate that San Mateo willfully

failed to comply with the FCRA by reporting the Account was in Bankruptcy in response to Plaintiff's dispute.

94. TU had actual knowledge of the Reaffirmation Agreement, since it at the very least received notice of the Reaffirmation Agreement through Plaintiff's dispute letter (if it did not already have notice prior to the dispute letter), but chose to inaccurately report that the Account was in Bankruptcy in response to Plaintiff's dispute.

95. TU's actual knowledge of the Reaffirmation Agreement on the Account indicate that TU willfully failed to comply with the FCRA by reporting the Account was in Bankruptcy in response to Plaintiff's dispute.

96. Reckless disregard of a requirement of the FCRA qualifies as a willful violation of the FCRA within the meaning of § 1681n(a). *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 71 (2007).

97. Based upon San Mateo's knowledge of the Reaffirmation Agreement and continued acceptance of Plaintiff's payments during the Bankruptcy and after, even if San Mateo could claim it did not willfully violate the FCRA, its conduct was at the very least done with reckless disregard of its obligations under 15 U.S.C. § 1681s-2(b).

98. Based upon TU's knowledge of the Reaffirmation Agreement even if TU could claim it did not willfully violate the FCRA, its conduct was at the very

least done with reckless disregard of its obligations under 15 U.S.C. § 1681e(b) and/or 15 U.S.C. § 1681i.

99. Metro 2 specifically instructs that reaffirmed debts should not be reported as discharged in bankruptcy.

100. Rather, according to Metro 2, a reaffirmed debt must be reported as reaffirmed.

101. Defendants' blatant non-compliance with Metro 2 further indicates the affirmation of errors on Plaintiff's credit report after notice of Plaintiff's dispute was willful.

102. Also as a result of Defendants' continued inaccurate and negative reporting, Plaintiff has suffered actual damages, including, without limitation, fear of credit denials, out-of-pocket expenses in challenging Defendants' inaccurate reporting, damage to Plaintiff's creditworthiness, damage to Plaintiff's credit reputation, and emotional distress.

103. Specific examples include credit denials from Navy Federal Credit Union and Synchrony Bank.

104. Plaintiff's credit reputation continues to be damaged as a result of Defendants' re-reporting that Plaintiff's Account was in Bankruptcy in response to Plaintiff's dispute.

105. By inaccurately reporting account information, Defendants' acts and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

106. The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than Plaintiff otherwise would.

107. Defendants' actions and omissions have caused Plaintiff's credit report to falsely indicate that Plaintiff's Account was in bankruptcy, thereby denying Plaintiff the positive effect of the reporting of Plaintiff's payments on the Account over the course of Plaintiff's Bankruptcy and after.

108. Creating the false impression of the Account being discharged in Bankruptcy creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's Equifax credit reports engaged in judgment-based lending.

109. Additionally, the existence of consumer reports which inaccurately report Plaintiff's Account, and/or falsely suggest that Plaintiff's Account has been discharged in Bankruptcy, make it inherently more difficult and more expensive for Plaintiff to refinance his car loan.

110. By inaccurately reporting account information after notice and confirmation of its errors, Defendants failed to take the appropriate measures as required under 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

### FIRST CAUSE OF ACTION
### THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681 *ET SEQ.* (FCRA)

111. Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

112. The foregoing acts and omissions constitute numerous and multiple violations of the FCRA.

113. As a result of each and every negligent violation of the FCRA, Plaintiff is entitled to actual damages, pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2), from Defendants.

114. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages or damages of not less than $100.00 and not more than $1,000.00, pursuant to 15 U.S.C. §1681n(a)(1)(A); punitive damages as the court may allow, pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from Defendants.

### REQUEST FOR JURY TRIAL

115. Plaintiff is entitled to, and demands, a trial by jury.

---

PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests the Court grant Plaintiff the following relief against Defendants:

1. A declaratory judgment that Defendants' actions as discussed herein are unlawful;

2. Plaintiff's actual damages from each Defendant;

3. Statutory damages of not less than $100.00 and not more than $1,000.00 to Plaintiff, pursuant to 15 U.S.C. § 1681n(a)(1), against each Defendant;

4. Punitive damages against Defendant, pursuant to 15 U.S.C. §1681n(a)(2);

5. An award of costs of litigation and reasonable attorney's fees, pursuant to 15 U.S.C. § 1681o(a)(2) or 15 U.S.C. § 1681n(a)(3), from Defendants; and

6. Any other relief the Court may deem just and proper.

KAZEROUNI LAW GROUP

Date: November 24, 2020

By:/s/ Anthony Chester
    Anthony P. Chester (Bar No. 0396929)
    KAZEROUNI LAW GROUP
    120 South 6th Street, Suite 2050
    Minneapolis, MN 55402
    Telephone:  (952) 225-5333
    Facsimile:   (800) 635-6425
    Email: tony@kazlg.com

    *Attorneys for Sean Burke*

## ACKNOWLEDGEMENT

The undersigned acknowledges that sanctions may be imposed pursuant to

Minn. Stat. § 549.211.

KAZEROUNI LAW GROUP

Date: November 24, 2020

By:/s/ Anthony Chester
Anthony P. Chester (Bar No. 0396929)
KAZEROUNI LAW GROUP
120 South 6th Street, Suite 2050
Minneapolis, MN 55402
Telephone:  (952) 225-5333
Facsimile:   (800) 635-6425
Email: tony@kazlg.com

*Attorneys for Sean Burke*